*Jamie Bennett v. Ashcraft & Gerel, LLP*, No. 31, Sept. Term 2022.  Opinion by Arthur, J.

**FEE-SHARING AGREEMENT—ENFORCEABILITY OF AGREEMENT**

Maryland Rule 19-305.6(a) prohibits an attorney from making "a partnership, shareholders, operating, employment, or other similar type of agreement that restricts the right of an attorney to practice after termination of the relationship, except an agreement concerning benefits upon retirement."  The rule is based on ABA Model Rule of Professional Conduct 5.6(a).

The policy underlying the rule is enunciated in Comment 1: "An agreement restricting the right of attorneys to practice after leaving a firm not only limits their professional autonomy but also limits the freedom of clients to choose an attorney."  The rule prohibits agreements not to practice within a particular geographic or substantive area, agreements not to represent any of the firm's clients, and restrictions on client contact or use of client information.  Financial disincentives for representing certain clients may violate Rule 5.6(a) if they are disguised attempts to penalize competition.

An agreement "in clear and flagrant violation" of the rules of professional conduct may be "unenforceable," because "it would be anomalous to allow a lawyer to invoke the court's aid in enforcing an unethical agreement when that very enforcement, or perhaps even the existence of the agreement sought to be enforced, would render the lawyer subject to discipline."  *Post v. Bregman*, 349 Md. 142, 168 (1998).

An agreement between a law firm and one of its attorneys concerning the division of a contingent fee that is earned after the attorney leaves the firm does not violate Maryland Rule 19-305.6(a), provided that the agreement endeavors to make a reasonable forecast of what a likely quantum meruit division of fees would have been.  In the absence of such an agreement, the parties' respective shares would be determined by principles of quantum meruit.  But to determine its quantum meruit share, the firm would have to sue the client and the departing lawyer to establish the reasonable value of the services that it provided to the client.  Lawyers should be encouraged to enter into agreements to resolve these kinds of potential disputes in advance and to avoid unseemly bickering over fees.

In this case, a law firm and one of its attorneys entered into an agreement concerning the division of a contingent fee that was generated after the attorney left the firm and was engaged by a client whom she had represented while she was at the firm.  The agreement calls for the division of fees based on a sliding scale.  The agreement compares the amount of time in which the firm was responsible for the client and the amount of time in which the attorney was responsible for the client.  Then it uses those factors as a surrogate for the parties' respective contributions to the outcome.  The agreement does not purport to restrict the right of the attorney to practice law or prohibit the attorney from representing the firm's clients.  Nor does it limit the freedom of clients to choose to

use the attorney's services.  And it does not penalize the attorney by requiring the forfeiture of a right that has already been earned.  The Appellate Court of Maryland held that this agreement did not violate Maryland Rule 19-305.6(a) on its face or as applied to the facts of this case.  The circuit court did not err upholding the enforceability of the agreement in this case.

**FEE SHARING AGREEMENT—AWARD OF PRE-JUDGMENT INTEREST**

Pre-judgment interest compensates judgment creditors for their inability to use the funds that should have been in their hands before the entry of judgment.  Pre-judgment interest is available as a matter of right when the obligation to pay and the amount due is certain, definite, and liquidated by a specific date prior to judgment such that the effect of the debtor's withholding payment was to deprive the creditor the use of a fixed amount as of a known date.

In this case, a lawyer received certain, definite, and liquidated settlement payments on discrete dates.  She was contractually obligated to remit a certain, definite, and liquidated percentage of those payments to her former firm, but failed to do so.  Hence, the firm was entitled to pre-judgment interest, as a matter of right, on each payment that she failed to make.  The pre-judgment interest ran from the date on which each payment became due until the date of the judgment.  The circuit court erred in denying the firm's request for pre-judgment interest.

Circuit Court for Prince George's County
Case No. CAL-18-36527

<u>REPORTED</u>

<u>IN THE APPELLATE COURT</u>

<u>OF MARYLAND</u>*

No. 31

September Term, 2022

_____

JAMIE BENNETT

v.

ASHCRAFT & GEREL, LLP

_____

Berger,
Arthur,
Tang,

JJ.

_____

Opinion by Arthur, J.

_____

Filed: October 27, 2023

* At the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

This case principally involves a dispute between a law firm and an attorney who was formerly employed by the firm. At the outset of her employment, the attorney and the firm entered into an agreement about how they would divide a contingent fee if she left the firm, was engaged by a client of the firm, and earned the fee after leaving the firm.

The attorney contends that the agreement violates the Maryland Attorneys' Rules of Professional Conduct and, thus, is unenforceable. On that premise, she withheld over $700,000.00 in fees that were due to the firm under the agreement.

For the reasons stated below, we shall hold that the agreement is not unenforceable on its face or as applied in the circumstances of this particular case. Consequently, we shall largely affirm the judgment of the Circuit Court for Prince George's County, which upheld the agreement and ordered the attorney to pay the fees that she had withheld in violation of it. We shall, however, vacate the judgment insofar as the circuit court failed to award pre-judgment interest to the firm. We shall remand the case with instructions to amend the judgment to include the undisputed amount of $81,212.10 in pre-judgment interest.

## BACKGROUND

### *The "Prenuptial Agreement"*

In 2011, after approximately 20 years as an Assistant United States Attorney, appellant and cross-appellee Jamie Bennett joined the law firm of Ashcraft & Gerel, LLP ("Ashcraft"). Ashcraft, the appellee and cross-appellant, is a regional law firm that

primarily represents plaintiffs on a contingent-fee basis. Ashcraft hired Ms. Bennett to take over its False Claims Act practice.[1]

Ms. Bennett began her employment with Ashcraft on April 1, 2011. On April 5, 2011, Ms. Bennett signed an agreement, to which the parties refer as the "Prenuptial Agreement." Ashcraft requires its attorneys to sign the Prenuptial Agreement as a condition of their employment.

The Prenuptial Agreement is not an employment agreement; it is a departure agreement. It governs the division of fees between Ashcraft and an attorney if the attorney leaves the firm, is retained by any of the firm's former clients, and settles the clients' cases after leaving the firm.

In the absence of an agreement like the Prenuptial Agreement, the parties' share of a contingent fee would be governed by principles of quantum meruit, under which the firm would have to show the extent to which it contributed to the client's success. *See, e.g.*, *Somuah v. Flachs*, 352 Md. 241, 257-58 (1998); *First Nat'l Bank of Md. v. Meyer,*

---

[1] In very brief summary, the False Claims Act, 31 U.S.C. § 3729, imposes liability on persons who defraud the United States by submitting false claims for payment, among other things. In addition to a civil penalty, the statute requires the wrongdoer to pay treble damages. 31 U.S.C. § 3729(a)(1). Under 31 U.S.C. § 3730(b)(1), a private party may file suit in the name of the United States to address a violation of the False Claims Act. The government may then elect to pursue the so-called "*qui tam*" action brought by the private party (who is also known as the "relator"). *See* 31 U.S.C. § 3730(c). If the government proceeds with the action, the relator is entitled to "receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim" (31 U.S.C. § 3730(d)(1)), as well as an "amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs." *Id.*

*Faller, Weisman & Rosenberg*, *P.C.*, 125 Md. App. 1, 20-23 (1999).  The Prenuptial

Agreement attempts to resolve these potential fee disputes in advance.

The Prenuptial Agreement uses a sliding-scale formula to apportion the division of

fees.  The formula considers two factors: (1) the amount of time between when the client

retained the firm and when the attorney departed, and (2) the amount of time between

when the attorney departed and when a fee was generated.

The Prenuptial Agreement provides as follows:

| Retained by Ashcraft & Gerel, LLP | Distribution of Fee to Ashcraft & Gerel, LLP By Period In Which Fee Generated | | |
|---|---|---|---|
| | Within One Year From Termination By Attorney | Within Two Years From Termination By Attorney | Within Three Years From Termination By Attorney |
| Prior to Two Years Before Attorney's Termination with Firm . . . . . . . . . . . . . . . | 75% | 70% | 65% |
| Between Two Years Before Attorney's Termination with Firm and One Year Before Attorney's Termination with Firm . . . . . . . . . . . . . . . . | 70% | 65% | 60% |
| Within One Year of Attorney's Termination with Firm . . . . . | 65% | 60% | 55% |

In summary, if the client retained the firm more than two years before the attorney

left, the firm's share of the fee ranges from 75 percent to 65 percent, depending on

whether the fee was generated within one year, two years, or three years of when the

attorney left.  If the client retained the firm between one and two years before the

attorney left, the firm's share of the fee ranges from 70 percent to 60 percent, depending,

again, on whether the fee was generated within one year, two years, or three years of when the attorney left. And if the client retained the firm less than a year before the attorney left, the firm's share of the fee ranges from 65 percent to 55 percent, depending on whether the fee was generated within one year, two years, or three years of when the attorney left.

The Prenuptial Agreement goes on to say that, when fees are generated more than three years after the attorney leaves the firm, Ashcraft receives 55 percent if the clients had been with the firm as long as they had been with the attorney; Ashcraft receives 50 percent if the clients had been with the attorney longer than they had been with the firm.

In effect, the Prenuptial Agreement focuses on the amount of time in which the firm was responsible for the client and the amount of time in which the attorney was responsible for the client. The Prenuptial Agreement uses those factors as a surrogate for the parties' respective contributions to the outcome. In general, under the Prenuptial Agreement, the longer the case was with the firm before the attorney departed, the greater the share of the fee for Ashcraft. On the other hand, the longer it took for the case to generate the fee after the attorney's departure, the lesser the share of the fee for the firm. Based on the percentages assigned to the firm, the agreement appears to assume that the firm typically makes a large investment of time, money, or both at the outset of an engagement.

Ms. Bennett signed the Prenuptial Agreement, but about six months later she formed the opinion that the agreement was unethical and that it violated the Maryland

4

Attorneys' Rules of Professional Conduct. She expressed her opinion to Ashcraft's managing partner.

### *The Barker Cases*

In February of 2012, Richard Barker retained Ashcraft to represent him in claims arising under the False Claims Act. Pursuant to his retainer agreement with Ashcraft, Barker agreed to pay 40 percent of any award to Ashcraft. Barker also agreed that any recovery of statutory attorneys' fees and costs would go to Ashcraft.

Ashcraft represented Barker in two False Claims Act cases that he brought on behalf of the United States: *United States ex rel. Barker v. Columbus Regional Healthcare Sys., et al.*, No. 4:12-cv-108 (M.D. Ga.); and *United States ex rel. Barker v. Columbus Regional Healthcare Sys., et al.*, No. 4:14-cv-304 (M.D. Ga.). Ms. Bennett was principally responsible for the representation.

The *Barker* cases settled in principle on April 3, 2015. Less than two months later, on May 29, 2015, Ms. Bennett gave Ashcraft four weeks' notice that she was resigning from the firm. She left on June 26, 2015. When she left, Mr. Barker chose to terminate his relationship with Ashcraft and to retain Ms. Bennett.

On September 2, 2015, the parties to the *Barker* cases, including Mr. Barker, entered into a written settlement agreement. The agreement obligated the defendants to pay between $25 million and $35 million to the United States and the State of Georgia, on a quarterly basis, over five years. At the time of the settlement, Ashcraft had advanced over $700,000.00 in legal fees and over $300,000.00 in costs.

Pursuant to the settlement agreement in the *Barker* cases, Mr. Barker would receive over $5,000,000.00, which was subject to a contingent fee of over $2,000,000.00. The settlement agreement also awarded Mr. Barker $675,000.00 in statutory attorneys' fees. Ms. Bennett asserts that, as a result of her efforts after she left the firm, Mr. Barker's share of the recovery increased from $3,750,000.00 to over $5,000,000.00. Ms. Bennett received the first installment of the settlement payments on September 3, 2015, the day after the settlement agreement was signed, and less than three months after she left the firm.

At the time of the settlement in the *Barker* cases, Ms. Bennett and Ashcraft disagreed about the enforceability of the Prenuptial Agreement and the fees to which Ashcraft was entitled from the *Barker* cases and others. Through counsel, the parties reached a negotiated agreement as to the *Barker* fees, which was memorialized in email dated October 5, 2015. In that agreement, Ashcraft and Ms. Bennett agreed to divide the fees in the *Barker* cases in accordance with the formula set out in the Prenuptial Agreement: 75 percent to Ashcraft and 25 percent to Ms. Bennett.

In accepting Ashcraft's settlement proposal on Ms. Bennett's behalf, Ms. Bennett's attorney stated that Ashcraft "should not interpret Ms. Bennett's agreement in this case as an admission regarding the validity of the prenuptial agreement." Ashcraft acknowledged Ms. Bennett's position and replied, "This agreement does not release or waive any rights Ashcraft may have with respect to any other issues with respect to Ms. Bennett's departure."

Ms. Bennett and Ashcraft authorized the United States Department of Justice to wire the *Barker* settlement proceeds and the statutory attorneys' fees to an escrow account established and held by Ms. Bennett's attorney. Ms. Bennett's attorney would then pay Ashcraft and Ms. Bennett from that escrow account in the agreed percentages: 75 percent to Ashcraft and 25 percent to Ms. Bennett.[2]

In August of 2016, Ms. Bennett informed Ashcraft that her attorney's escrow account had been closed because of inactivity. She asked Ashcraft to consent to having the settlement proceeds deposited into a new escrow in her name. Ashcraft consented on the understanding that Ms. Bennett would continue to disburse the attorneys' fees in accordance with the parties' agreement.

### The Whipple Case

Before Ms. Bennett joined Ashcraft in 2011, the firm had entered into a joint venture with another firm to represent Robert Whipple in a case under the False Claims Act: *United States ex rel. Whipple v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, No. 3-11-0206 (M.D. Tenn.). After Ms. Bennett joined the firm, she worked on the *Whipple* case. Following her departure from Ashcraft, Ms. Bennett continued to represent Mr. Whipple until his case settled in the summer of 2016. The settlement generated about $160,000.00 in fees.

---

[2] In her recitation of the facts, Ms. Bennett asserts that, at the time of the settlement, Ashcraft was "eager, if not desperate, to receive a share of the Barker recovery." Despite Ashcraft's alleged desperation, however, it settled for the figure dictated by the Prenuptial Agreement.

On August 29, 2016, Ms. Bennett sent an email to Ashcraft's attorney to "resolve the disposition of the fees." In the email, Ms. Bennett stated: "Under the pre-nuptial agreement, I'm entitled to one third of the fees, since more than a year had passed since my departure from the firm when the settlement was finalized." In a subsequent email, dated October 1, 2016, Ms. Bennett stated:

> The case stayed with me after I left A & G[;] the settlement was finalized on June 22, 2016 (1 year and one month after I resigned from A & G, 1 year and 3 days after my 4 week notice period ended). Under our agreement, I am entitled to 30% of the fees, which total about $160k . . . . A &G's share would be (approximately) $112 and $48k to me.

In another email, dated October 6, 2016, Ms. Bennett wrote that the *Whipple* case "went with [her] when [she] left the firm," that her co-counsel "specifically asked [her] to continue working on the case," and that "under the pre-nuptial agreement, [she is] entitled to a 30% share of ALL fees that are paid as a result of that case." She added: "This is how we approached Barker, and there is no legally justifiable reason for a different approach to this case."

On October 16, 2016, Ashcraft agreed to divide the *Whipple* fees in accordance with the Prenuptial Agreement, as Ms. Bennett had proposed.

### *Ms. Bennett's Decision to Withhold Ashcraft's Share of the Barker Fees*

Ms. Bennett paid Ashcraft its 75 percent share of the settlement payments in the *Barker* cases through July of 2018. Beginning in October of 2018, however, Ms. Bennett stopped paying Ashcraft. Instead, she deposited Ashcraft's share into her operating account and paid it to herself. Ms. Bennett's action coincided with the commencement of this action against Ashcraft.

### *Procedural Background*

On October 5, 2018, Ms. Bennett filed a complaint against Ashcraft. The complaint asserted claims for tortious interference with prospective advantage, breach of contract, and recission and requested a declaration that the Prenuptial Agreement was unenforceable. The complaint did not mention the *Barker* cases. Instead, it concerned a dispute involving another client, a Dr. Emmanuele.

After the court denied a motion to dismiss, Ashcraft answered the complaint. The answer, which was filed on April 4, 2019, included the affirmative defense that Ms. Bennett's claims "are barred by the doctrines of estoppel and waiver."

On June 5, 2019, Ms. Bennett filed an amended complaint, which she was allowed to do without leave of court. *See* Md. Rule 2-341(a). The amended complaint added new factual allegations and a number of new counts relating to the *Barker* cases. Among other things, Ms. Bennett alleged that she had paid a portion of the *Barker* fees to Ashcraft in consideration for Ashcraft's agreement not to argue that she had waived her right to challenge the Prenuptial Agreement. She alleged that Ashcraft had breached that agreement when the firm included the affirmative defense of waiver in its answer. She sought to recover the $1.6 million in fees that she had previously paid to Ashcraft out of the *Barker* settlement. She also sought to rescind the Prenuptial Agreement on various grounds. Finally, she sought a declaration that the Prenuptial Agreement was unenforceable.

9

On July 10, 2019, Ashcraft moved to dismiss Ms. Bennett's amended complaint. In an order dated October 4, 2019, but not docketed until more than a month later, the court denied Ashcraft's motion.

Ashcraft answered the amended complaint on October 16, 2019, two days before the answer was due. *See* Md. Rule 2-341(a); Md. Rule 2-321(a). The answer included a counterclaim containing several counts related to the *Barker* cases.

Although Ashcraft was not even required to file its counterclaim until 30 days after it filed its answer (*see* Md. Rule 2-331(d)), Ms. Bennett moved to strike it. On December 5, 2019, the court granted the motion and struck the counterclaim. The court may have been motivated by an impending trial date of February 10, 2020.

In an order dated January 14, 2020, but not docketed until a month later, the court permitted Ms. Bennett to file a second amended complaint. On approximately January 16, 2020, Ms. Bennett apparently filed[3] a second amended complaint, which added two *Barker*-related counts.

In total, Ms. Bennett's second amended complaint included 13 counts. Count I, which concerned a client other than Barker, alleged tortious interference with prospective economic advantage. Counts II through VI asserted claims for fraudulent

---

[3] Both parties have proceeded as though Ms. Bennett actually filed a second amended complaint on that date. But although a copy of the second amended complaint is attached to Ms. Bennett's motion for leave to amend, the court docket does not reflect that the second amended complaint was ever accepted for filing. Nor do Maryland Judiciary Case Search or MDEC reflect that any such document was ever accepted for filing. Ms. Bennett needed court approval to file the second amended complaint, because the putative filing date was less than 30 days before the trial date. Md. Rule 2-341(a).

misrepresentation, negligent misrepresentation, promissory estoppel, unjust enrichment, and fraud in the inducement based on the firm's alleged "promise" or "representation" that it would not contend that Ms. Bennett had waived her right to contest the enforceability of the Prenuptial Agreement. Count VII asked the court to rescind the October 2015 settlement agreement because the firm had allegedly "repudiated" that agreement by asserting that Ms. Bennett had waived her right to contest the Prenuptial Agreement. Count VIII alleged that the firm had breached the Prenuptial Agreement by seeking to obtain fees not covered by that agreement. Counts IX through XI asked the court to rescind the Prenuptial Agreement on the ground that it is unenforceable under the Maryland Attorneys' Rules of Professional Conduct,[4] among other things. Count XII asserted a claim for "money had and received," which sought to recover the portion of the *Barker* fees that Ms. Bennett had paid to Ashcraft. Finally, Count XIII requested a declaration that the Prenuptial Agreement is unenforceable and "void *ab initio*" because it violates the Rules of Professional Conduct and various common-law principles. Among other authorities, Ms. Bennett cited Rule 5.6(a) of the ABA's Model Rules of Professional Conduct, on which Maryland Rule 19-305.6(a) is based.[5]

---

[4] Maryland Rules 19-300.1 to 19-308.5.

[5] Rule 19-305.6 provides as follows:

An attorney shall not participate in offering or making:

(a) a partnership, shareholders, operating, employment, or other similar type of agreement that restricts the right of an attorney to practice after

11

On January 23, 2020, the parties invoked Maryland Rule 2-502 in a joint request for the court to determine whether the Prenuptial Agreement was enforceable under the Rules of Professional Conduct and the common law.[6]  The docket reflects that on January 24, 2020, the trial was postponed (i.e., that "civil try by date" was waived).

On January 31, 2020, Ashcraft moved to dismiss all counts in Ms. Bennett's second amended complaint, except for Count I, which alleged tortious interference with prospective economic advantage with respect to a client other than Barker.

On February 21, 2020, before the court had decided the motion to dismiss, Ashcraft filed an answer to the second amended complaint and a counterclaim.  The counterclaim was identical to the counterclaim to Ms. Bennett's first amended complaint in all respects but one: the new counterclaim added a count alleging that Ashcraft had

termination of the relationship, except an agreement concerning benefits upon retirement; or

(b) an agreement in which a restriction on the attorney's right to practice is part of the settlement of a client controversy.

[6] Maryland Rule 2-502 sets forth the procedure for obtaining the resolution of a pure question of law.  Rule 2-502 states:

If at any stage of an action a question arises that is within the sole province of the court to decide, whether or not the action is triable by a jury, and if it would be convenient to have the question decided before proceeding further, the court, on motion or on its own initiative, may order that the question be presented for decision in the manner the court deems expedient. In resolving the question, the court may accept facts stipulated by the parties, may find facts after receiving evidence, and may draw inferences from these facts.  The proceedings and decisions of the court shall be on the record, and the decisions shall be reviewable upon appeal after entry of an appealable order or judgment.

12

detrimentally relied on Ms. Bennett's promise to keep the *Barker* settlement proceeds in her escrow account and to distribute 75 percent of the fees to the firm.[7]

Again, Ms. Bennett filed a motion to dismiss and strike Ashcraft's counterclaims to her second amended complaint as untimely under Md. Rule 2-331. The circuit court denied Ms. Bennett's motion.

On July 9, 2020, the circuit court ruled that the Prenuptial Agreement did not violate the Maryland Attorneys' Rules of Professional Conduct and that it was enforceable under Maryland common law. On that same day, the court dismissed all counts of Ms. Bennett's second amended complaint, with prejudice, except for Count I, which did not relate to the *Barker* cases.

The court did not disclose the reasoning underlying either of the rulings. In light of those rulings, however, the only remaining issues involved Count I of Ms. Bennett's second amended complaint (for tortious interference with respect to a client other than Barker) and the issues in Ashcraft's counterclaim.

After the court had dismissed most of her case and ruled that the Prenuptial Agreement was enforceable, Ms. Bennett filed a series of three motions for sanctions against Ashcraft and its attorneys. In brief summary, the motions asserted that Ashcraft and the attorneys had made misrepresentations to the court when they denied Ms. Bennett's contention that Ashcraft had agreed not to argue that she waived the right to

---

[7] Counts I through IV of the counterclaims remained the same. The claim for detrimental reliance became Count V. Count V of the earlier counterclaim, which requested a declaratory judgment, became Count VI.

challenge the Prenuptial Agreement. On September 13, 2021, the circuit court denied all three of the motions for sanctions.

Before trial, which was scheduled to begin on November 2, 2021,[8] both parties renewed their motions for summary judgment on Ashcraft's counterclaims. On October 26, 2021, the circuit court denied Ms. Bennett's motion for summary judgment on Ashcraft's counterclaims and granted Ashcraft's cross-motion for summary judgment on its counterclaim for breach of contract.

On that same date, the court imposed a constructive trust on all monies received by Ms. Bennett in the *Barker* cases on behalf of Ashcraft, including some $387,000.00 that she had received in November 2019. In addition, the court ordered Ms. Bennett to provide "a complete accounting of all funds she has received in the *Barker* cases from August 6, 2018 forward, the dates on which those funds were received, how those funds have been distributed, to whom, and in what amount, and the present status of those funds."

On October 27, 2021, the parties agreed that all that remained was a calculation of Ashcraft's damages. The parties stipulated to the dismissal of the sole remaining count of Ms. Bennett's second amended complaint and of the unadjudicated counts in Ashcraft's counterclaim. The circuit court agreed that the parties could submit a proposed order or orders with calculations of Ashcraft's damages once Ms. Bennett provided Ashcraft with the required accounting.

---

[8] The trial date had been continued on March 26, 2020, and again on June 29, 2020, as a result of the COVID-19 pandemic.

14

On October 29, 2021, Ms. Bennett provided Ashcraft with information regarding all payments she had received in the *Barker* cases since August 2018. Ashcraft used this information to calculate that the damages on its breach of contract claim totaled $706,164.83, not including pre-judgment interest. Ashcraft requested pre-judgment interest.

In an order dated November 2, 2021, but not docketed until November 15, 2021, the circuit court issued a declaratory judgment stating that the Prenuptial Agreement is enforceable. In a second order dated November 2, 2021, and docketed on November 15, 2021, the court entered judgment against Ms. Bennett in the amount of $706,164.83. The court awarded no pre-judgment interest.

On November 15, 2021, Ms. Bennett moved for reconsideration. The court denied her motion on February 18, 2022.

Ms. Bennett noted an appeal on March 8, 2022. Ashcraft noted a cross-appeal from the denial of the claim for pre-judgment interest on March 23, 2022.

## QUESTIONS PRESENTED

Ms. Bennett raises the following questions, which we have reworded and re-ordered in the interest of concision:

1. Whether the circuit court erred in concluding that the Prenuptial Agreement is an enforceable contract under the Maryland Rules of Professional Conduct and Maryland common law;

2. Whether the circuit court erred in granting summary judgment in favor of Ashcraft on its breach of contract claim against Ms. Bennett for withholding payment of the *Barker* fees;

15

3. Whether the court erred in dismissing Counts II (fraudulent misrepresentation), III (negligent misrepresentation), VI (fraud in the inducement), and VII (recission) of Ms. Bennett's second amended complaint;

4. Whether the circuit court erred in imposing a constructive trust;

5. Whether the circuit court erred when it allowed Ashcraft to file counterclaims in response to Ms. Bennett's second amended complaint; and

6. Whether the circuit court erred in denying Ms. Bennett's motions for sanctions.[9]

---

[9] Ms. Bennett phrased her questions as follows:

I. Whether a restrictive covenant in a law firm's employment agreement requiring Bennett to pay her former firm more than $2.4 million for goodwill for a single client violates the public interest as expressed in Maryland Rules of Professional Conduct 5.6, 1.7 and 1.8 and/or constitutes an impermissible penalty under Maryland common law.

II. Whether Judge Dawson erred by granting Ashcraft summary judgment on a breach of contract claim where the evidence was undisputed that the law firm itself repeatedly breached a material term of that contract.

III. Whether Judge Dawson's decision to grant Ashcraft equitable and legal relief on its breach of contract counterclaim was legally correct.

IV. Whether Judge Dawson's dismissal of Counts II (fraudulent misrepresentation), III (negligent misrepresentation), VI (fraud in the inducement), and VII (rescission) of Bennett's [Second Amended Complaint] was legally correct where the allegations of the [Second Amended Complaint], read in the light most favorable to Bennett, stated legally cognizable claims for rescission and fraud arising out of Ashcraft's breach of the October 2015 Settlement Agreement.

V. Whether Judge Dawson's refusal to strike Ashcraft's renewed counterclaims asserted in an Answer responding to the [Second Amended Complaint] filed with leave of court was legally correct under applicable res judicata principles and Maryland Rules 2-322, 2-324 and 2-341(b).

VI. Whether Judge Dawson erred when he relied upon confidential settlement

16

In Ashcraft's cross-appeal, it raised the following issue, which we have reworded: Whether the circuit court erred by failing to award Ashcraft pre-judgment interest.[10]

## DISCUSSION

## I. ENFORCEABILITY OF THE PRENUPTIAL AGREEMENT

The parties filed a joint motion for a ruling under Maryland Rule 2-502, asking the circuit court to determine: (1) whether the Prenuptial Agreement violates the Maryland Attorneys' Rules of Professional Conduct and (2) whether the Prenuptial Agreement is enforceable under Maryland common law. The circuit court determined that the agreement did not violate the rules and that it was enforceable under the common law. An appellate court reviews that legal determination without deference. *See Bender v. Schwartz*, 172 Md. App. 648, 664 (2007).

### A. Is the Validity of the Prenuptial Agreement a Moot Question?

Ms. Bennett asserts that the October 2015 settlement agreement is "independently enforceable under Maryland law." "The parties agree," she says, that the settlement agreement constitutes an enforceable contract. Indeed, it would seem that the October

---

negotiations in granting summary judgment for the law firm.

VII. Whether Judge Dawson abused his discretion when he denied Bennett's motions for sanctions under Maryland Rule 1-341, given the law firm's and its counsel's clear misconduct in litigating a breach of contract claim which indisputably has no merit under Maryland law.

[10] Ashcraft phrased its question as follows: "Whether the circuit court erred by failing to award the Firm prejudgment interest on its successful summary judgment claim for a certain, definite, and liquidated amount that was known prior to judgment?"

17

2015 settlement agreement was an accord and satisfaction that replaced the Prenuptial Agreement, at least with respect to the *Barker* fees. Thus, Ashcraft argues that "the question of whether the Prenuptial Agreement is enforceable is moot."

Were that so, it would greatly simplify the task before us. In the circuit court, however, both parties proceeded as though the enforceability of the Prenuptial Agreement was the overarching issue in the case. For example, Ashcraft requested *and obtained* a money judgment on Count I of its counterclaim, which alleged that Ms. Bennett had breached the Prenuptial Agreement, not the October 2015 settlement agreement. Similarly, Ashcraft requested *and obtained* a declaratory judgment that the Prenuptial Agreement is valid. Conversely, Ms. Bennett sought a declaration that the Prenuptial Agreement was unenforceable, and several counts of her second amended complaint sought to rescind the Prenuptial Agreement. Both parties invoked Rule 2-502 to obtain the circuit court's decision about whether the Prenuptial Agreement was enforceable. Finally, Ms. Bennett asserts that she continues to represent Ashcraft's former clients and that the validity of the Prenuptial Agreement remains a live issue as to the division of any fees generated in those matters.

In these circumstances, the validity of the Prenuptial Agreement remains a live controversy. We cannot decline to decide that issue on the ground that it is moot.

### B. Enforceability of Prenuptial Agreement under Rules of Professional Conduct

The Rules of Professional Conduct contain statements of public policy to which agreements among lawyers are subject. *See Post v. Bregman*, 349 Md. 142, 168 (1998). An agreement "in clear and flagrant violation" of such a rule may be "unenforceable,"

18

because "it would be anomalous to allow a lawyer to invoke the court's aid in enforcing an unethical agreement when that very enforcement, or perhaps even the existence of the agreement sought to be enforced, would render the lawyer subject to discipline." *Id.*

Ms. Bennett's challenge principally involves a disciplinary rule that pertains to lawyers: Maryland Rule 19-305.6(a). The rule is based on the Ethics 2000 Amendments to the ABA Model Rules of Professional Conduct: Maryland Rule 19-305.6(a) is based on Model Rule 5.6(a).[11]

Most of the authorities in Maryland and elsewhere refer to the ABA Model Rules. The older Maryland cases use the numbering in the Model Rules, because the Maryland Attorneys' Rules of Professional Conduct did not become part of Title 19 of the

---

[11] In her second amended complaint, Ms. Bennett alleged that the Prenuptial Agreement violated Maryland Rule 19-301.5(e), the counterpart of ABA Model Rule 1.5(3). She does not press that point on appeal, but if she did, she would not prevail. Maryland Rule 19-301.5(e) provides:

> A division of a fee between attorneys who are not in the same firm may be made only if: (1) the division is in proportion to the services performed by each attorney or each attorney assumes joint responsibility for the representation; (2) the client agrees to the joint representation and the agreement is confirmed in writing; and (3) the total fee is reasonable.

A Michigan court explained why ABA Model Rule 1.5(e) does not apply to agreements like the Prenuptial Agreement:

> [Rule] 1.5(e) is designed to prohibit brokering, to protect a client from clandestine payment and employment, and to prohibit aggrandizement of fees. Plainly, none of these concerns is implicated in this case. . . . The agreement is simply a mechanism for dividing an already existing fee. In other words, this is not a referral situation contemplated by the rule.

*McCroskey, Feldman, Cochrane & Brock, P.C. v. Waters*, 494 N.W.2d 826, 828 (Mich. Ct. App. 1992) (internal citation omitted).

19

Maryland Rules until 2016. Consequently, in our discussion of applicable rules, we will, from time to time, also use the numbering in the Model Rules.

Maryland Rule 19-305.6(a) provides:

An attorney shall not participate in offering or making:

>   (a) a partnership, shareholders, operating, employment, or other similar type of agreement that restricts the right of an attorney to practice after termination of the relationship, except an agreement concerning benefits upon retirement[.]

Rule 5.6(a) and Maryland Rule 19-305.6(a) require a much more detailed discussion. Those rules, once again, prohibit agreements that "restrict[] the right of an attorney to practice after termination of the relationship, except an agreement concerning benefits upon retirement[.]"

"Rule 5.6(a) prohibits employment agreements designed to prevent lawyers from competing with their former firms after they change jobs." Ellen J. Bennett, Helen W. Gunnarsson & Nancy G. Kisicki, *Annotated Model Rules of Professional Conduct* 610 (10th ed. 2023). "These include promises not to practice within a particular geographic or substantive area, promises not to represent any of the firm's clients, and restrictions on client contact or use of client information." *Id.* "Financial disincentives for taking 'firm' clients violate Rule 5.6 if they are disguised attempts to penalize competition." *Id.* at 613.

The policy underlying Rule 5.6(a) and Maryland Rule 19-305.6(a) is enunciated in Comment 1: "An agreement restricting the right of attorneys to practice after leaving a

20

firm not only limits their professional autonomy but also limits the freedom of clients to choose an attorney."

Ms. Bennett argues that the Prenuptial Agreement is unenforceable under Rule 19-305.6(a) because, in her view, the agreement places "a burden on a departing lawyer's ability to practice law and a client's choice of counsel." We disagree that the Prenuptial Agreement is invalid on its face—i.e., we disagree that the Prenuptial Agreement is categorically unenforceable under any and all circumstances. We also disagree that the Prenuptial Agreement is unenforceable under the circumstances presented in this particular case.

The Prenuptial Agreement addresses a well-known and longstanding problem in the practice of law: When a lawyer leaves a firm and is engaged by one of the firm's clients before a contingent fee is earned in the client's case, how do the lawyer and the firm divide the fee?

In the absence of an advance agreement like the Prenuptial Agreement, the parties' respective shares would be determined by principles of quantum meruit, "based on the reasonable value of services rendered" by the firm "prior to [its] discharge." *See*, *e.g.*, *Somuah v. Flachs*, 352 Md. at 258; *id.* at 268 n.8; *see* Geoffrey Hazard, Jr., W. William Hodes & Peter R. Jervis, *The Law of Lawyering* § 50.03 (4th ed. 2023) (stating that, "[f]or flat fee or contingent fee matters . . . the approach *in the absence of an express agreement* is typically done on a quantum meruit basis, by comparing the value provided to the client by the pre-departure work to the value of the work that would be done post-departure[]") (emphasis added); Jacob A. Stein & Andrew M. Beato, *The Law of Law*

21

*Firms* § 5.12, at 194 (2021 ed.) (stating that, "[*w*]*here there is no fee-division agreement between the firm and the attorney*, courts generally hold that the firm is entitled to recover a fee on the basis of quantum meruit after the contingency has occurred[]")
(emphasis added).[12]

Quantum meruit actions present a number of difficult procedural and practical problems. First, the firm must name its former client as a defendant, because the client owes the fee. *See Somuah v. Flachs*, 352 Md. at 263 (stating that "[t]he primary rationale for permitting *quantum meruit* recovery is to prevent unjust enrichment to the client of the benefits of the attorney's services prior to discharge"). In addition, the firm must join the other lawyer, because the firm's recovery will be derived from the other lawyer's share of the recovery. *Id.* at 268 n.8.

In a quantum meruit action, proving the reasonable value of services rendered prior to discharge can be a factually intensive exercise, with competing experts and acrimonious charges and counter-charges. *See*, *e.g.*, *Brault Graham, LLC v. Law Offices*

---

[12] Citing *Brault Graham, LLC v. Law Offices of Peter G. Angelos, P.C.*, 211 Md. App. 638, 674 (2013), Ms. Bennett argues that "a discharged attorney may not claim a contractual entitlement to a former client's contingency fee based upon its retainer agreement with that client but may only seek *quantum meruit*." Ms. Bennett has misstated the holding in that case. In *Brault Graham* this Court held "that, when a client discharges his or her lawyer, any contingency fee contract ceases to exist, and generally, *absent contractual language to the contrary*, any fee-splitting agreement predicated on the initial contingency fee contract also ceases to exist." *Id.* (emphasis added.) In any event, in this case, Ashcraft is not asserting a "contractual entitlement to a former client's contingency fee based upon its retainer agreement with that client." It is asserting a contractual right to a portion of the fee based upon an agreement with a former employee, Ms. Bennett, who left the firm and took the client before the fee was generated.

*of Peter G. Angelos*, *P.C.*, 211 Md. App. 638 (2013).  It is difficult to imagine how a firm could prove the reasonable value of the services that it performed without a full-blown trial.  In addition, the cost of litigation will consume a considerable portion of everyone's share of the fees.  And quarrelling over fees does not put the legal profession in the best possible light.[13]

Agreements like the Prenuptial Agreement attempt to avoid these problems by requiring the parties to stipulate, in advance, to something resembling a forecast of what a quantum meruit division of the fees would be.  Rule 5.6(a) does not "preclude enforcement of fee-allocation agreements logically related to the anticipated financial impact of the lawyer's departure."  Bennett, et al., *Annotated Model Rules of Professional Conduct*, *supra*, 614.  Thus, the authorities have generally upheld such agreements.  Hazard, et al., *The Law of Lawyering* § 50.03, *supra*, at 50-09 (citing *Barna, Guzy & Steffen, Ltd. v. Beens*, 541 N.W.2d 354 (Minn. Ct. App. 1995); *McCroskey, Feldman, Cochrane & Brock, P.C. v. Waters*, 494 N.W.2d 826 (Mich. Ct. App. 1992)); *see also Groen, Laveson, Goldberg & Rubenstone v. Kancher*, 827 A.2d 1163, 1165, 1171-72 (N.J. Super. Ct. App. Div. 2003).

In 1989 the Ethics Committee of the Maryland State Bar Association reviewed an agreement with some similarities to the one in this case.  MSBA Ethics Comm., Formal

---

[13] Under Maryland law, if the client discharged one of the attorneys because of "serious misconduct, *i.e.*, fraud or illegal conduct, etc.," then "the attorney is not entitled to any fee." *Somuah v. Flachs*, 352 Md. at 256.  Consequently, in a zero-sum battle over a finite sum of money that is being depleted by the cost of litigation, one lawyer may have an incentive to charge the other with "serious misconduct."

23

Op. 1989-29 (1989), https://perma.cc/P7PZ-KPBN.  The Ethics Committee's opinion "'is advisory, and is not binding on this Court'" (*Attorney Grievance Comm'n v. Carithers*, 421 Md. 28, 54 n.14 (2011), quoting *Attorney Grievance Comm'n v. Gregory*, 311 Md. 522, 531-32 (1988)), but it is still "persuasive authority, where our case law and rules are silent on a particular issue[.]"  *Id*.

In the 1989 opinion, the agreement in question had a "sliding chart with respect to the division of fees," much like the sliding scale in the Prenuptial Agreement.  MSBA Ethics Comm., Formal Op. 1989-29.  Under the "sliding chart," the fee division was "based upon a combination of the length of time that the case was in the law firm prior to the attorney's termination and the period of time in which the fee is realized after the attorney has left the firm," much like the fee division in the Prenuptial Agreement.  The Ethics Committee concluded that this agreement did "not violate" Rule 5.6(a) of the Rules of Professional Conduct, the predecessor of Rule 19-305.6(a).  MSBA Ethics Comm., Formal Op. 1989-29.  The Committee explained that it did "not view" the agreement as an agreement that "restricts the right of a lawyer to practice after termination of the relationship."  *Id.*  It wrote:

> The subject agreement does not purport to restrict the right of a departing attorney to practice law.  It contains no restrictive covenants, nor does it contain any prohibition against a departing attorney from representing prior clients of the firm.  What it does do is to provide, in advance of the termination of employment, for the division of fees to be earned by the law firm and attorney respectively.

*Id.*

24

The Committee added that "the agreement does not limit the freedom of clients to choose to utilize the services of the departing attorney." *Id.* "Rather, it defines in advance of any controversy the division of fees in a manner somewhat akin to a provision for liquidated damages." *Id.*

Similarly, in 1991 the Legal Ethics Committee of the District of Columbia Bar considered and generally approved of an agreement that appears to be substantively identical to the Prenuptial Agreement. D.C. Ethics Comm., Formal Op. 221 (1991), https://perma.cc/AZZ3-K5NT. In that opinion, the agreement under review "provide[d] a sliding chart whereby the fee will be divided between the departed attorney and the firm based on a combination of [the] length of time the case was with the firm before the attorney left and [the] length of time it is with the attorney before the fee is realized." *Id.* For example:

> [I]f the firm was retained prior to two years before the attorney left the firm and the fee is realized within one year after the attorney's departure, the firm is entitled to 75% of the fee. The lowest percentage taken by the firm is 55% for cases in which the firm was retained within one year of the attorney's departure and where the fee is not realized until two to three years after the departure date.

*Id.*

The Committee concluded that those fee provisions "do not violate the Rules of Professional Conduct." *Id.* The Committee reasoned that "the fee division agreement at issue in this inquiry seeks compensation for work already performed by the firm." *Id.* It added:

> One purpose of predetermined fee-sharing with a departing lawyer is to avoid the unseemly bickering and the potential for litigation over clients

25

and fees that can occur when a departing lawyer takes clients whose matters are being handled on a contingent fee basis. The agreement here applies only in contingent[-]fee personal injury cases in which significant costs may be incurred by the firm near the beginning of the attorney-client relationship. Fees ultimately realized are divided on a percentage basis which varies according to the length of time the case was handled by the firm and the length of time it was handled separately by the departing lawyer.

*Id.* (footnote omitted).

The Committee cautioned that it could "neither approve nor disapprove the specific percentages" used in the agreement. *Id.* The Committee volunteered, however, that "[i]f the percentages represent a generally fair allocation of fees based on the firm's historical experience there is no violation of Rule 5.6(a)," the counterpart of Maryland Rule 19-305.6(a).

By contrast, in 1993, the MSBA Ethics Committee opined that a different agreement, with no sliding scale, would violate the predecessor of Rule 19-305.6(a). MSBA Ethics Comm., Formal Op. 1993-21 (1989), https://perma.cc/BR8W-TQ7A. Although the opinion does not clearly describe the terms of the agreement in question, it appears that the firm would receive 50 percent of the fees if the client had engaged the firm less than 45 days before the attorney left and 66.6 percent if the client had engaged the firm more than 45 days before the attorney left. *Id.*

In disapproving of this agreement, the Committee distinguished the agreement in the 1989 opinion. Unlike that earlier agreement, the Committee wrote, the agreement before it did "not 'slide,'" but contained two rigid tiers. *Id.* In other words, unlike the earlier agreement, this agreement did not account for the amount of time in which the

26

departing attorney had had the sole responsibility for the client; rather it assigned two-thirds of the fee to the firm whenever the client had engaged the firm more than six weeks before the attorney left. The Committee added that, "[b]ecause the arbitrary fee division percentages" applied "to all cases, the effect of this contract would be to restrict the [departing] attorney's practice after termination." *Id.* In some cases, the Committee opined, "the percentage would be so high as to discourage the attorney from taking the case," thereby denying the clients the attorney of their choice. *Id.*

The North Carolina State Bar cited both of the MSBA opinions in opining that "a lawyer may participate in the offering or making of an . . . agreement that includes a provision for dividing fees following a lawyer's departure from a firm[,] provided the formula or procedure for dividing fees is, at the time the agreement is made, reasonably calculated to compensate the firm for the resources expended by the firm on the representation as of the date of the lawyer's departure and will not discourage a departing lawyer from taking a case and thereby deny the client access to the lawyer of his choice." N.C. State Bar, Formal Ethics Op. 2008-8 (2008), https://perma.cc/M4FY-YUZU.

Citing one of their earlier opinions, the North Carolina authorities wrote that "agreements that resolve the division of contingent fees received after a lawyer leaves a law firm 'prevent clients from being put in the middle of a dispute between lawyers.'" *Id.* (citing N.C. State Bar, Ethics Decision 2000-6 (2000)). For that reason, "lawyers are encouraged to enter into agreements that will resolve such potential disputes fairly and without rancor." *Id.*

The North Carolina opinion specifically approved of an agreement that used a sliding scale similar to that of the Prenuptial Agreement: "The formula allocates to the firm a percentage of the fee equivalent to the amount of time that the lawyer represented the client while the lawyer was employed by the firm and receiving compensation from the firm." *Id.* "Thus," the opinion concluded, "the departed lawyer[s] will be fully compensated for any work that [they] perform[] on a case after [they] leave[] the firm and will not be discouraged from the continued representation of clients who desire [their] services." *Id.*

A number of cases from other jurisdictions have considered the validity of agreements like the Prenuptial Agreement. Those cases have unanimously rejected the contention that such agreements violate Rule 5.6(a).

In *McCroskey, Feldman, Cochrane & Brock, P.C. v. Waters*, 494 N.W.2d 826 (Mich. Ct. App. 1993), the agreement required a departing attorney to remit varying percentages of the contingent fees, depending on the progress of the case at the time when the client engaged the attorney. *See id.* at 827. In essence, the closer the case was to resolution when the client engaged the departing attorney, the greater the percentage the attorney would have to remit to the firm. *See id.*

The Michigan court immediately recognized that this "contract simply seeks to obviate time-consuming squabbles that formerly arose when [the firm's] entitlement to its fair share of any fee generated by a departing client's file was determined on a quantum meruit basis." *Id.* at 828. The court agreed with the firm that "such arrangements, as long as they are reasonable, should be encouraged." *Id.*

28

In holding that the agreement did not violate Michigan's version of Model Rule 5.6(a), the court wrote that the provisions were "not so overreaching that they amount to an actual restriction on [the departing attorney's] right to practice law." *Id.* The court explained that the agreement "reasonably assign[ed] to [the departing attorney] a ratable proportion of a given fee on the basis of the stage of the litigation at the time of departure." *Id.* at 828-29. "Although the percentages [were] arguably imperfect," the court did "not deem it appropriate to require precision." *Id.* at 829. Because the agreement was "a reasonable attempt to relate [the firm's] fee entitlement to the amount of work done on a given file before it left the firm[,]" the court held that it did not violate Rule 5.6(a). *Id.*

In *Barna, Guzy & Steffen, Ltd. v. Beens*, 541 N.W.2d 354 (Minn. Ct. App. 1995), the court considered an agreement that required the departing attorney to pay 50 percent of any contingent fees generated in a matter in which one of the firm's former clients followed him to his new firm. *Id.* at 355-56. The departing lawyer argued that the 50-50 split operated as a "financial disincentive," restricting his "future practice, as well as the client's right to choose a lawyer." *Id.* at 357. The Minnesota court disagreed.

In reaching its decision, the court perceived that "[t]he focus of [its] decision is the client." *Id.* It wrote that the rule's "'underlying purpose is to ensure the freedom of clients to select counsel of their choice, despite its wording in terms of the lawyer's right to practice.'" *Id.* (quoting *Jacob v. Norris, McLaughlin & Marcus*, 607 A.2d 142, 146 (N.J. 1992)). But the court distinguished the agreement in that case from the type of agreement that typically runs afoul of Rule 5.6(a)—one that "penalizes an attorney for

29

continuing to represent certain clients" (*id.*) by, for example, requiring attorneys to forfeit compensation otherwise due if they went into competition with the firm. *See*, *e.g.*, *Jacob v. Norris, McLaughlin & Marcus*, 607 A.2d at 152-53. Under the agreement in the Minnesota case, the court observed, the departing lawyer "would have received less than 50% of the contingency if he had remained at the firm." *Barna, Guzy & Steffen, Ltd. v. Beens*, 541 N.W.2d at 357. For that reason, the court concluded that "there [was] no incentive" for him to decline the representation of the firm's former clients. *Id.* "If such agreements cannot be enforced," the court commented, "law firms will face instability because attorneys will be motivated to leave firms when they receive lucrative contingent fee cases, and attorneys will be encouraged to battle over clients." *Id.* at 356.[14]

Finally, in *Groen, Laveson, Goldberg & Rubenstone v. Kancher*, 827 A.2d 1163 (N.J. Super. Ct. App. Div. 2003), the court upheld an agreement, similar to the one in the Minnesota case, which required the departing attorney to pay 50 percent of any contingent fees generated in a matter in which one of the firm's former clients followed him to his new firm. *Id.* at 1163-64. Like the Minnesota court, the court distinguished agreements that require departing attorneys to forfeit compensation if they go into competition with their former firm. *Id.* at 1165; *id.* at 1169. The court saw nothing in the record to establish that the agreement prevented the departing attorney from continuing his practice or handling cases that clients wanted him to take from his former firm. *Id.* at

---

[14] The court made this final comment while holding that the agreement did not violate Model Rule 1.5, the counterpart to Maryland Rule 19-301.5, but the comment applies equally to Rule 5.6(a).

1169. The court approvingly quoted the Minnesota court's observation that, "'[i]f such agreements cannot be enforced, law firms will face instability because attorneys will be motivated to leave firms when they receive lucrative contingent fee cases, and attorneys will be encouraged to battle over clients.'" *Id.* at 1171 (quoting *Barna, Guzy & Steffen, Ltd. v. Beens*, 541 N.W.2d at 356). Finally, the court approvingly quoted a Louisiana court, which had said that agreements of this sort are "'actually very conducive to the orderly conduct of practicing law'" and that it "'approves of contracts whereby attorneys avoid unnecessary litigation by setting up formulas between themselves which allow for the orderly break up of a law practice.'" *Id.* at 1172 (quoting *Walker v. Carimi Law Firm*, 725 So.2d 592, 595 (La. Ct. App. 1998)).

In view of these authorities, we conclude that the Prenuptial Agreement is not unenforceable on its face—i.e., that it is not facially invalid. We are persuaded by the 1989 MSBA ethics opinion, which approved an agreement with a sliding-scale formula, much like Ashcraft's—one in which the division of fees is "based upon a combination of the length of time that the case was in the law firm prior to the attorney's termination and the period of time in which the fee is realized after the attorney has left the firm." MSBA Ethics Comm., Formal Op. 1989-29. We are also persuaded by the 1991 District of Columbia ethics opinion, which approved an agreement that seems almost identical to Ashcraft's—one in which the "[f]ees ultimately realized are divided on a percentage basis which varies according to the length of time the case was handled by the firm and the length of time it was handled separately by the departing lawyer." D.C. Ethics Comm., Formal Op. 221. We are persuaded as well by the Michigan Court of Appeals' decision

31

in *McCroskey*, which upheld an agreement under which the departing attorney received "a ratable proportion of a given fee on the basis of the stage of the litigation at the time of departure." *McCroskey, Feldman, Cochrane & Brock, P.C. v. Waters*, 494 N.W.2d at 828-29.

Like the agreement at issue in the 1989 MSBA ethics opinion, the Prenuptial Agreement "does not purport to restrict the right of a departing attorney to practice law." MSBA Ethics Comm., Formal Op. 1989-29. Nor does the Prenuptial Agreement "limit the freedom of clients to choose to utilize the services of the departing attorney." *Id.* The Prenuptial Agreement "contains no restrictive covenants, nor does it contain any prohibition against a departing attorney from representing prior clients of the firm." *Id.* Nor does it penalize the attorney by withholding a benefit otherwise owed (*see Barna, Guzy & Steffen, Ltd. v. Beens*, 541 N.W.2d at 357) or by requiring the forfeiture of earned compensation. *See Groen, Laveson, Goldberg & Rubenstone v. Kancher*, 827 A.2d at 1165, 1169. Instead, the Prenuptial Agreement simply provides for a division of fees in advance of termination. *See* MSBA Ethics Comm., Formal Op. 1989-29.

In other words, the Prenuptial Agreement "defines in advance of any controversy the division of fees in a manner somewhat akin to a provision for liquidated damages." *Id.* It benefits both the firm and the departing attorney because it "seeks to obviate time-consuming squabbles" about what the parties' respective shares of a fee might be under principles of quantum meruit. *McCroskey, Feldman, Cochrane & Brock, P.C. v. Waters*, 494 N.W.2d at 827. It also benefits the firm and the attorney in that it endeavors to "avoid the unseemly bickering and the potential for litigation over clients and fees that

32

can occur when a departing lawyer takes clients whose matters are being handled on a contingent fee basis." D.C. Ethics Comm., Formal Op. 221. The agreement benefits clients as well, because it "'prevent[s] them from being put in the middle of a dispute between lawyers'" (N.C. State Bar, Formal Ethics Op. 2008-8 (citing N.C. State Bar, Ethics Decision 2000-6)), as they would have to be in a quantum meruit suit by the former firm.

The Prenuptial Agreement achieves these ends by assigning "a ratable proportion of a given fee" to the departing attorney "on the basis of the stage of the litigation at the time of departure." *McCroskey, Feldman, Cochrane & Brock, P.C. v. Waters*, 494 N.W.2d at 828-29. "[S]uch arrangements, as long as they are reasonable, should be encouraged." *Id.* at 828.

The Prenuptial Agreement is not unreasonable on its face. The agreement's sliding-scale recognizes that in a contingent-fee matter "significant costs may be incurred by the firm near the beginning of the attorney-client relationship." D.C. Ethics Comm., Formal Op. 221. Because the Prenuptial Agreement must forecast what quantum meruit might require in an array of circumstances, "precision" is not required. *McCroskey, Feldman, Cochrane & Brock, P.C. v. Waters*, 494 N.W.2d at 829. Even if the percentages are "arguably imperfect," the agreement is valid if it represents "a reasonable attempt to relate [the firm's] fee entitlement to the amount of work done on a given file before it left the firm." *Id.*

The Prenuptial Agreement differs from the rigid, two-tier system that the MSBA disapproved in its 1993 ethics opinion. Unlike the percentages at issue in the agreement

33

in that opinion, the percentages in the Prenuptial Agreement are not "arbitrary." Rather, they relate the amount of time when the firm had responsibility for the matter to the amount of time when the departing attorney had responsibility for the matter. They attempt to forecast a likely quantum meruit division by using time as a surrogate for the value contributed by each of the respective parties. The forecasts may not correspond perfectly with the dictates of quantum meruit in every instance, but they are certainly not "arbitrary." They represent "a reasonable attempt to relate [the firm's] fee entitlement to the amount of work done on a given file before it left the firm." *McCroskey, Feldman, Cochrane & Brock, P.C. v. Waters*, 494 N.W.2d at 829. The Prenuptial Agreement is not unenforceable on its face.

Nor is the Prenuptial Agreement unenforceable as applied to the facts before us in this case. As applied to the *Whipple* fee, Ms. Bennett could not possibly contend that the fee division dictated by the Prenuptial Agreement is unreasonable, because she insisted that the parties adhere to the agreement.

As applied to the *Barker* fee, the fee division dictated by the Prenuptial Agreement was not unreasonable either. The *Barker* cases generated over $2.8 million in fees, of which Ms. Bennett received 25 percent under the Prenuptial Agreement. Therefore, Ms. Bennett earned over $700,000.00 for taking over a case that had already been settled in principle and securing an increase in the client's percentage of the recovery. That is by no means a paltry fee. She probably "would have received less" (*Barna, Guzy & Steffen, Ltd. v. Beens*, 541 N.W.2d at 357) had she remained with the firm. The Prenuptial Agreement did not create an incentive for her to decline to represent Mr. Barker.

34

In the circuit court and in her appellate brief, Ms. Bennett relied prominently on cases that hold that Rule 5.6(a) prohibits what are called "forfeiture for competition" provisions—contractual provisions that require attorneys to forfeit vested contractual rights or earned compensation if they leave a firm and go into competition with it. *See, e.g., Cohen v. Lord, Day & Lord*, 550 N.E.2d 410, 411 (N.Y. 1989) (invalidating a provision that required departing partners to forfeit their share of the firm's profits representing unpaid fees, and fees for services performed but not yet billed at the time of departure, if they left and practiced law in competition with the firm); *see also Jacob v. Norris, McLaughlin & Marcus*, 607 A.2d 142, 146-52 (N.J. 1992) (invalidating an agreement that required lawyers to forfeit "termination compensation," including a percentage of their annual draw, amounts owed to them by the firm, and an interest in future profits, if but only if they went into competition with the firm); *but see Howard v. Babcock*, 863 P.2d 150, 151 (Cal. 1993) (holding that "an agreement among law partners imposing a reasonable toll on departing partners who compete with the firm is enforceable"); Bennett, et al., *Annotated Model Rules of Professional Conduct*, *supra*, 612-14 (collecting authorities).

The New Jersey court distinguished forfeiture-for-competition provisions from advance agreements to divide an unearned fee (*Groen, Laveson, Goldberg & Rubenstone v. Kancher*, 827 A.2d at 1165; *id.* at 1169), as did the Minnesota court. *Barna, Guzy & Steffen, Ltd. v. Beens*, 541 N.W.2d at 357. Simply put, in the case of an agreement like the Prenuptial Agreement (and the agreements in the Minnesota and New Jersey cases), a lawyer does not forfeit a contractual right by going into competition with the firm. As an

35

employee of Ashcraft, for example, Ms. Bennett had no contractual right to a share of any fees that might be earned in the future. Thus, she did not forfeit any contractual rights when she agreed to a formula for the division of any fees that might be earned after she left the firm. Instead, she gave up the right to be sued, along with her client, in a quantum meruit action brought by her former firm.[15]

In summary, the Prenuptial Agreement is neither unenforceable on its face nor unenforceable as applied in the circumstances of this case. Much like an enforceable liquidated damages clause, which "must provide a fair estimate of potential damages at the time the parties entered into the contract," when the damages are "incapable of estimation, or very difficult to estimate,"[16] the Prenuptial Agreement endeavors to provide a fair estimate of a likely quantum meruit fee division at a time when the fee division is, at a minimum, very difficult to estimate. *See* MSBA Ethics Comm., Formal Op. 1989-29. We agree with the Michigan Court of Appeals that "such arrangements, as long as they are reasonable, should be encouraged." *McCroskey, Feldman, Cochrane &*

---

[15] In a brief footnote, Ms. Bennett contends, in passing, that the Prenuptial Agreement also violates Maryland Rules 19-301.7 and 19-301.8, which pertain, generally, to conflicts of interest. Arguably, her contention is not properly before us because of the cursory manner in which she has presented it. *See* Md. Rule 8-504(a)(6) (requiring a brief to contain "[a]rgument in support of a party's position on each issue"); *Impac Mortgage Holdings, Inc. v. Timm*, 245 Md. App. 84, 117 (2000) (holding that the "failure to present sufficient argument in his appellate brief means that [a party] has waived his challenge to the court's . . . ruling). But even if the cursory argument were before us, we would reject it, because Ms. Bennett cites no authority other than the rules themselves. She does not even quote or discuss the language of the rules to explain how the Prenuptial Agreement creates some kind of impermissible conflict.

[16] *Barrie School v. Patch*, 401 Md. 497, 510 (2007).

*Brock, P.C. v. Waters*, 494 N.W.2d at 828. We also agree with the North Carolina State Bar that lawyers should be "encouraged to enter into agreements that will resolve such potential disputes fairly and without rancor." N.C. State Bar, Formal Ethics Op. 2008-8. Lastly, like the New Jersey and Louisiana courts, we "'approve[] of contracts whereby attorneys avoid unnecessary litigation by setting up formulas'"—reasonable formulas— "'which allow for the orderly break up of a law practice.'" *Groen, Laveson, Goldberg & Rubenstone v. Kancher*, 827 A.2d at 1172 (quoting *Walker v. Carimi Law Firm*, 725 So.2d at 595).[17]

### C. Enforceability of Prenuptial Agreement under Maryland Common Law

In a fallback argument, Ms. Bennett contends that the Prenuptial Agreement is unenforceable at common law because, she says, it operates as an impermissible penalty. Her argument has no merit.

Ms. Bennett invokes the general principles concerning the enforceability of restrictive covenants in employment agreements, as enunciated in cases like *Holloway v. Faw Casson & Co.*, 319 Md. 324 (1990). As discussed at length above, however, the Prenuptial Agreement does not contain a restrictive covenant: if it did, we would not need to discuss the common law, because the agreement would violate Model Rule 5.6(a) and Maryland Rule 19-305.6(a).

---

[17] Although the Prenuptial Agreement is not facially invalid and not invalid as applied to the facts in this case, we do not hold that the Prenuptial Agreement is valid in every conceivable factual scenario in which it might applied. It is entirely conceivable that the agreement might dictate an unreasonable division of fees if, for example, the departing attorney had responsibility for the matter for many years after the client left Ashcraft.

Citing *Willard Packaging Co. v. Javier*, 169 Md. App. 109 (2006), Ms. Bennett likens the Prenuptial Agreement to a liquidated damages clause that is unenforceable because it unfairly penalizes an employee for competing. But we have already held that the Prenuptial Agreement endeavors to provide a fair estimate of a likely quantum meruit fee division. On its face and as applied in this case, the Prenuptial Agreement does not penalize Ms. Bennett for competing with the firm.

Finally, Ms. Bennett argues, at some length, that, in disputes with other attorneys who left the firm and went into competition, Ashcraft compromised its claim to a fee. In her case, however, she says that the firm refused to compromise. This, she infers, evidences Ashcraft's intention to punish her. The short answer to her contention is that, even if Ashcraft struck other deals in other disputes with other attorneys, the firm had no obligation to offer her the same deal that it offered to them. The record contains no basis for the conclusion that the Prenuptial Agreement, either on its face or as applied in this case, violates Maryland's common law.[18]

---

[18] As an additional basis to conclude that Ashcraft deployed the Prenuptial Agreement in order to punish her, Bennett cites *Ashcraft & Gerel v. Coady*, 244 F.3d 948 (D.C. Cir. 2001), a case in which Ashcraft asserted a contractual claim for liquidated damages in response to a former partner's material breach of his employment agreement. *See id.* at 949. The employment agreement included the Prenuptial Agreement, but the alleged breach appears to have concerned other provisions. *See id.* at 949 n.1 (citing *Coady v. Ashcraft & Gerel*, 996 F. Supp. 95, 98 (D. Mass. 1998)). Bennett points out that in *Coady* an Ashcraft partner testified that a "liquidated damages provision" of some sort "was designed to penalize an attorney who sought to compete with the firm[.]" *Id.* at 955. The United States Court of Appeals for the District of Columbia Circuit was unimpressed: "Notwithstanding" that testimony, the court wrote, "the terms of the employment contract are readily distinguishable from a contract not to compete." *Id.* The court ultimately affirmed the trial court's decision not to strike Ashcraft's claim for

## II. SUMMARY JUDGMENT ON BREACH OF CONTRACT CLAIM

The circuit court granted Ashcraft's motion for summary judgment on its counterclaim for breach of contract. Ms. Bennett challenges that ruling. We see no error.

When a party moves for summary judgment, the court "shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2-501(f).

Whether a circuit court properly granted summary judgment is a question of law. *See*, *e.g.*, *Butler v. S & S P'ship*, 435 Md. 635, 665 (2013). In an appeal from the grant of summary judgment, an appellate court conducts a de novo review to determine whether the circuit court's conclusions were legally correct. *See*, *e.g.*, *D'Aoust v. Diamond*, 424 Md. 549, 574 (2012). In doing so, the court determines whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law. *Chateau Foghorn LP v. Hosford*, 455 Md. 462, 482 (2017). The appellate court considers "the record in the light most favorable to the nonmoving party and construe[s] any reasonable inferences that may be drawn from the facts against the moving party." *Blackburn Ltd. P'ship v. Paul*, 438 Md. 100, 107-08 (2014) (citations and quotation marks omitted).

On the merits, it is undisputed that in October of 2015 Ashcraft and Ms. Bennett agreed to divide the fees in the *Barker* cases in accordance with the Prenuptial

---

liquidated damages. *Id.* In short, *Coady* adds nothing meaningful to the analysis in this case.

Agreement. It is undisputed that for three years thereafter Ms. Bennett adhered to that agreement and paid the percentage of the fee dictated by the Prenuptial Agreement. It is also undisputed that Ms. Bennett ceased making payments in October of 2018, when she commenced this action (by filing a complaint that made no mention of the *Barker* cases). Finally, it is undisputed that, between October of 2018 and the entry of judgment, Ms. Bennett failed to remit $706,164.83 in fees, not including pre-judgment interest. It would seem, therefore, that Ashcraft has indisputably established all of the elements of its breach of contract claim.

Ms. Bennett responds that she did not breach the contract by failing to remit those payments, because, she says, her performance was excused. According to Ms. Bennett, Ashcraft "promised," in the settlement agreement in the *Barker* dispute, that it would not assert a defense of waiver. Thus, Ms. Bennett concludes that, when Ashcraft asserted the affirmative defenses of waiver and estoppel in its answer to the original complaint, she no longer had any obligation to perform.

Ms. Bennett's argument has multiple problems. The first is temporal: Ashcraft did not assert the affirmative defense of waiver or estoppel until April 4, 2019, about six months after Ms. Bennett stopped remitting the payments. Ms. Bennett's performance could not have been excused as a result of something that had yet to occur when she stopped performing.

A larger problem is that, in the October 2015 settlement agreement, Ashcraft did not agree that it would never, under any circumstances, raise the defense of waiver; Ashcraft merely agreed that Ms. Bennett did not waive her contention that the Prenuptial

40

Agreement was unenforceable when she agreed to divide the *Barker* fees in accordance with the Prenuptial Agreement. Ashcraft cautioned, however, that it did "not release or waive any rights [Ashcraft] may have with respect to any other issues with respect to Ms. Bennett's departure." Thus, Ashcraft certainly did not agree that it would refrain from asserting the defense of waiver if, for example, Ms. Bennett took an inconsistent position on the validity of the Prenuptial Agreement, as she did when she demanded that the *Whipple* fees be divided in accordance with the Prenuptial Agreement. In other words, the October 2015 settlement agreement did not prohibit Ashcraft from alleging that Ms. Bennett's perspective on the enforceability of the Prenuptial Agreement varied as a function of whether she was or was not satisfied with the fee dictated by the Prenuptial Agreement in any given case.[19]

Finally, Ms. Bennett contends that her contract with Ashcraft was illegal and that one cannot breach an illegal contract. In a variant of that argument, Ms. Bennett contends that it was impossible for her to perform under the contract because the contract

---

[19] Ms. Bennett argues that her statements in the *Whipple* settlement negotiations are inadmissible under Maryland Rule 5-408(a). Rule 5-408(a) provides, in pertinent part, that "[c]onduct or statements made in compromise negotiations or mediation" are "not admissible to prove the validity, invalidity, or amount of a civil claim in dispute." Rule 5-408(c) adds, however, that "[e]xcept as otherwise provided by law, evidence of a type specified in section (a) of this Rule is not excluded under this Rule when offered for another purpose[.]" Ashcraft did not use Ms. Bennett's statements "to prove the validity, invalidity, or amount of" her civil claim to the *Whipple* fees; Ashcraft used the statements for "another purpose"—specifically, to show that Ms. Bennett was content to insist on the application of the allegedly unenforceable Prenuptial Agreement when she thought that it was in her interest to do so. Thus, Rule 5-408(a) did not make Ms. Bennett's statements inadmissible.

41

was illegal.[20]  We have previously rejected Ms. Bennett's contention that the Prenuptial

Agreement was unenforceable, either on its face or as applied in the circumstances of this

case.  Consequently, we reject Ms. Bennett's defenses of illegality and impossibility.

The circuit court did not err in concluding that, on the undisputed facts of this case,

Ashcraft was entitled to judgment as a matter of law on its counterclaim for breach of

contract.

### III. DISMISSAL OF CLAIMS IN SECOND AMENDED COMPLAINT

The circuit court granted a motion to dismiss all but one count of Ms. Bennett's

13-count second amended complaint for failure to state a claim upon which relief can be

granted.  Ms. Bennett voluntarily dismissed the sole surviving count.

On appeal, Ms. Bennett contends that the court erred in dismissing Counts II, III,

VI, and VII of the second amended complaint.  Those counts purported to assert claims

for fraudulent misrepresentation, negligent misrepresentation, "fraudulent inducement,"

and recission.

The counts for fraudulent misrepresentation and negligent misrepresentation

alleged that Ashcraft had falsely represented that it "would accept payment from the

Barker settlements without considering those payments binding and without contending

---

[20] At various points, Ms. Bennett argues that the October 2015 settlement agreement "is separately enforceable" from the Prenuptial Agreement.  If so, it is unclear how the alleged invalidity of the Prenuptial Agreement could excuse Ms. Bennett's performance under the settlement agreement.  We do not consider that question, however, because Ashcraft said that it had filed suit to enforce the Prenuptial Agreement, not a separate agreement that took the place of the Prenuptial Agreement with respect to the *Barker* fees.

42

that [Ms. Bennett] had waived her right to contest the [Prenuptial] Agreement." The count for fraudulent inducement alleged that Ashcraft falsely "represented that it would accept payment of the [*Barker*] fee without waiving [sic] [Ms. Bennett's] right to contest the [Prenuptial Agreement]."[21] The count for recission alleged that Ashcraft had "materially repudiated the agreement the parties reached in October, 2015 that payments made to [Ashcraft] would not waive [Ms. Bennett's] right to challenge the [Prenuptial Agreement]."

In ruling on a motion to dismiss for failure to state a claim, the circuit court considers only the facts alleged in the complaint and any supporting exhibits incorporated into the complaint. *See, e.g.*, *RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 643 (2010). A court, however, need not accept the truth of pure legal conclusions (*Margolis v. Sandy Spring Bank*, 221 Md. App. 703, 713 (2015)) or of "[m]ere conclusory charges that are not factual allegations." *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 335 (2009). Moreover, "[a]ny ambiguity or uncertainty in the allegations bearing on whether the complaint states a cause of action must be construed against the pleader." *Id.* Dismissal is proper if, even after assuming the truth of all well-pleaded factual allegations and after drawing all reasonable inferences from those allegations in favor of the pleader, the pleader would still not be entitled to relief. *See, e.g.*, *O'Brien & Gere Eng'rs, Inc. v. City of Salisbury*, 447 Md. 394, 403-04 (2016).

---

[21] The second amended complaint probably meant to allege that Ashcraft represented that it would accept payment of the *Barker* fees without asserting that Ms. Bennett had waived her right to contest the Prenuptial Agreement.

On review of the grant of a motion to dismiss, the appellate court analyzes whether the trial court's ruling was legally correct, without any deference to that court's legal conclusions. *Patton v. Wells Fargo Fin. Maryland, Inc.*, 437 Md. 83, 95 (2014). This Court may affirm the dismissal of a complaint on any ground adequately shown by the record, regardless of whether the trial court relied on that ground or whether the parties raised that ground. *Mostofi v. Midland Funding, LLC*, 223 Md. App. 687, 695-96 (2015).

To prevail on a claim for fraud or "fraudulent inducement,"[22] a plaintiff must allege facts establishing:

(1) that the defendant made a false representation to the plaintiff;

(2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;

(3) that the misrepresentation was made for the purpose of defrauding the plaintiff;

(4) that the plaintiff relied on the misrepresentation and had the right to rely on it and

(5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*See, e.g.*, *Sass v. Andrew*, 152 Md. App. 406, 429 (2003).

To prevail on a claim for negligent misrepresentation, a plaintiff must allege facts establishing:

---

[22] "'Fraud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'" *Sass v. Andrew*, 152 Md. App. 406, 432 (2003) (quoting *Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524, 529 (8th Cir. 1999)).

44

(1) that the defendant, owing a duty of care to the plaintiff, negligently asserted a false statement;

(2) that the defendant intended that the plaintiff would act upon the statement;

(3) that the defendant knew that the plaintiff would probably rely on the statement and that the plaintiff would suffer loss or injury if the statement was erroneous;

(4) that the plaintiff, justifiably, took action in reliance on the statement; and

(5) that the plaintiff suffered damages proximately caused by the defendant's negligence.

*See, e.g.*, *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 451 Md. 600, 627 n.18 (2017).

Ms. Bennett's second amended complaint did not adequately allege that Ashcraft made a false statement, much less that it made a false statement that it knew to be false or with reckless disregard as to its falsity. Consequently, she failed to allege the first element of a claim for fraud, "fraudulent inducement," or negligent misrepresentation.

The second amended complaint alleges that, in October 2015, when Ashcraft's attorney acknowledged Ms. Bennett's contention that she did not waive her right to assert that the Prenuptial Agreement was unenforceable when she agreed to divide the *Barker* fees in accordance with that agreement, the attorney knew or, in the alternative, should have known that her statement was false, and that Ashcraft actually intended to assert that Ms. Bennett *had* waived her right to assert that the Prenuptial Agreement was unenforceable. Yet, even read in the light most favorable to Ms. Bennett, the only bases for that allegation are that Ashcraft benefitted from the settlement agreement, which is

45

true of virtually all agreements, and that Ashcraft asserted the affirmative defenses of waiver and estoppel in its answer more than three years later. Those allegations do not suffice to establish the first element of the claims for fraud, fraudulent inducement, or negligent misrepresentation.

Ms. Bennett characterizes the attorney's statement as a promise that Ashcraft would never raise a defense of waiver. The breach of an alleged promise, alone, does not establish that the promissor never intended to perform the alleged promise. *See Tufts v. Poore*, 219 Md. 1, 10 (1959). Furthermore, without evidence of a present intention not to perform, fraud "'cannot be predicated on statements which are merely promissory in nature, or upon expressions as to what will happen in the future.'" *Sass v. Andrew*, 152 Md. App. at 438 (quoting *Levin v. Singer*, 227 Md. 47, 63 (1961)). Nor can negligent misrepresentation. *See Miller v. Fairchild Indus., Inc.*, 97 Md. App. 324, 346 (1993). With only these allegations before it, therefore, the circuit court correctly concluded that Ms. Bennett failed to state a claim upon which relief can be granted.[23]

---

[23] There is an additional reason why the allegations of fraud and fraudulent inducement failed to state a claim. "Although Rule 2-305 generally requires that a complaint contain only 'a clear statement of the facts necessary to constitute a cause of action,' Maryland courts have long required parties to plead fraud with particularity." *McCormick v. Medtronic, Inc.*, 219 Md. App. 485, 527 (2014). The requirement of particularity ordinarily means that a plaintiff must identify who made what false statement, when, and in what manner (*i.e.,* orally, in writing, etc.); why the statement is false; and why a finder of fact would have reason to conclude that the defendant acted with scienter (*i.e.,* that the defendant either knew that the statement was false or acted with reckless disregard for its truth) and with the intention to persuade others to rely on the false statement. *Id.* at 528 (citing *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013)). Ms. Bennett's second amended complaint contains no allegations explaining how a finder of fact could conclude that Ashcraft acted with scienter.

This leaves the count for recission. Recission is a remedy for the violation of certain rights, and not a stand-alone claim or cause of action. *Parker v. American Brokers Conduit*, 179 F. Supp. 3d 509, 521 (D. Md. 2016); *see also* 17A Am. Jur. 2d *Contracts* § 535 (May 2023 update) (stating that "[r]escission of a contract is only a remedy, not a cause of action"). In this case, the putative violation is Ashcraft's "repudiation" of its allegedly false statement that it would never assert a defense of waiver. The count fails for the same reason that Ms. Bennett's other counts fail: she did not adequately allege that Ashcraft knowingly or negligently made a false representation of a material fact. The circuit court, therefore, did not err in dismissing the count for recission.[24]

## IV. IMPOSITION OF CONSTRUCTIVE TRUST

On the same day as it granted Ashcraft's motion for summary judgment on the claim for breach of contract, the court imposed a constructive trust on all payments received by Ms. Bennett in the *Barker* cases on behalf of Ashcraft since November 2019. Ms. Bennett argues that the court erred in imposing the constructive trust.

---

[24] In its brief, Ashcraft argues that Ms. Bennett's demand for recission has no basis in the factual record developed in discovery. For example, Ashcraft argues that Ms. Bennett insisted on the application of the Prenuptial Agreement in settling the dispute over the *Whipple* fees. Thus, Ashcraft argues that Ms. Bennett sought both to rescind the agreement and to selectively enforce it, which she cannot do. Ashcraft's argument is correct, but it is irrelevant to the analysis of the motion to dismiss the count for recission. In evaluating the merits of that motion, we are generally confined to the allegations of the pleading and any exhibits attached thereto. Those materials did not disclose Ms. Bennett's attempt to selectively enforce the agreement.

"'A constructive trust is the remedy employed by a court . . . to convert the holder of legal title to property into a trustee for one who in good conscience should reap the benefits . . . of [the] property.'" *Robinette v. Hunsecker*, 439 Md. 243, 255 (2014) (quoting *Wimmer v. Wimmer*, 287 Md. 663, 668 (1980)).  "The remedy is applied by operation of law where property has been acquired by fraud, misrepresentation, or other improper method, or where the circumstances render it inequitable for the party holding the title to retain it."  *Wimmer v. Wimmer*, 287 Md. at 668.  "A constructive trust is not a matter of right, *ex debito justitiae*,[25] but rests in the discretion of the court, to be imposed or denied according to the circumstances of the case."  *Starleper v. Hamilton*, 106 Md. App. 632, 640 (1995).

Citing *Washington Suburban Sanitary Commission v. Utilities, Inc. of Maryland*, 365 Md. 1, 39 (2001), Ms. Bennett asserts that a constructive trust is a remedy for unjust enrichment.  Citing *County Commissioners of Caroline County v. J. Roland Dashiell & Sons*, 353 Md. 83, 96 (2000), she asserts that Ashcraft could not pursue an unjust enrichment claim, because it sought to enforce an express contract.  Therefore, she concludes that Ashcraft had no right to a constructive trust.

Ms. Bennett takes too narrow a view of the circuit court's powers.  Here, the court concluded that Ms. Bennett had breached her contract with Ashcraft by failing to remit over $700,000.00 in fees that she had agreed to receive in her escrow account and to

---

[25] "Ex debito justitiae" means "from debt to justice."  David M. Walker, *The Oxford Companion to Law* 444 (1980).  It refers to "[t]hat which an applicant is entitled to as of right, as distinct from what may be granted in the exercise of discretion."  *Id.*

disburse to Ashcraft. Ms. Bennett had agreed to hold those funds as a fiduciary for Ashcraft. *Roman v. Sage Title Grp., LLC*, 229 Md. App. 601, 613 (2016), *aff'd*, 455 Md. 188 (2017). Instead, however, she distributed the disputed funds to herself. In the circumstances of this case, where Ashcraft's claim for breach of contract asked the court to "grant[] such other and further relief as" it "deem[ed] just and proper," the court did not abuse its discretion in imposing a constructive trust on the funds that Ms. Bennett held as a fiduciary, but distributed to herself.[26]

## V. REFUSAL TO STRIKE COUNTERCLAIM

On January 14, 2020, Ms. Bennett obtained leave of court to file her second amended complaint. At that time, the scheduled trial date was three weeks away.

Ms. Bennett apparently filed the second amended complaint on approximately January 16, 2020.[27] A few days later, the parties jointly requested that the court decide the issue of whether the Prenuptial Agreement was enforceable, and the court postponed the trial.

On January 31, 2020, Ashcraft moved to dismiss Counts II through XII of Ms. Bennett's second amended complaint. On February 21, 2020, Ashcraft answered the

---

[26] Ashcraft has argued that, even though Ms. Bennett disputed Ashcraft's entitlement to the funds, she had an ethical obligation, under Maryland Rule 19-301.15(e), to keep the funds separate from her own and those of the client. *See generally* ABA Standing Comm. on Ethics and Prof'l Responsibility, Formal Op. 487 (June 18, 2019). Ms. Bennett disputes this interpretation of her ethical obligations. Citing an opinion of the MSBA Ethics Committee, Ethics Docket No. 2018-03, Ms. Bennett argues that an attorney does not have a duty to segregate funds owed to a third party "unless the party's interest has been reduced to a statutory lien or a judgment."

[27] *See supra* n.3.

second amended complaint and asserted a counterclaim.  Ashcraft's counterclaim was largely identical to a counterclaim that the court had stricken a few months earlier, before it had postponed the trial.

Ms. Bennett moved to strike Ashcraft's counterclaim.  The court denied the motion and ultimately entered judgment in Ashcraft's favor on Count I of the counterclaim.

On appeal, Ms. Bennett contends that the circuit court erred in denying her motion to strike the counterclaim.  In support of that contention, Ms. Bennett argues that the previous ruling, in which the court struck an earlier counterclaim, was "res judicata."  Ms. Bennett's contention has no merit.

"[T]he doctrine of res judicata precludes the relitigation of a suit if (1) the parties in the present litigation are the same or in privity with the parties to the earlier action; (2) the claim in the current action is identical to the one determined in the prior adjudication; and (3) there was a final judgment on the merits in the previous action." *Powell v. Breslin*, 430 Md. 52, 63-64 (2013).

The ruling by which the court struck the earlier counterclaim was not a final judgment on the merits.  Rather, it was an interlocutory order that the court was free to revise and reconsider at any time before the entry of a final judgment.  *See* Md. Rule 2-602(a).[28]  The order could not possibly have been res judicata as to Ashcraft's ability to assert a counterclaim in response to another amended complaint.

---

[28] Rule 2-602(a) provides as follows:

50

Furthermore, when the court struck the original counterclaim, the trial date was only a few months away. When the court declined to strike the subsequent counterclaim, however, the court had postponed the trial, and the parties were awaiting a legal decision about whether the Prenuptial Agreement was enforceable. In these circumstances, the court acted well within the wide range of its discretion in declining to strike the subsequent counterclaim. *See Mattvidi Assocs. Ltd. P'ship v. NationsBank of Virginia, N.A.*, 100 Md. App. 71, 80 (1994) (explaining a circuit court's decision to grant a motion to strike a counterclaim is discretionary and "will be reversed on appeal only if that discretion has been abused[]").

## VI. SANCTIONS

After the circuit court had dismissed her *Barker* claims against Ashcraft, Ms. Bennett filed a series of three motions for sanctions against Ashcraft and its attorneys. Ms. Bennett based the motions on her contention that Ashcraft and its counsel had acted

---

Except as provided in section (b) of this Rule, an order or other form of decision, however designated, that adjudicates fewer than all of the claims in an action (whether raised by original claim, counterclaim, cross-claim, or third-party claim), or that adjudicates less than an entire claim, or that adjudicates the rights and liabilities of fewer than all the parties to the action:

(1) is not a final judgment;

(2) does not terminate the action as to any of the claims or any of the parties; and

(3) is subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties.

in bad faith and had "willfully mislead [sic]" the circuit court by "continu[ing] to make serious and significant misrepresentations regarding the scope of the parties' October 2015 Settlement Agreement relating to the payment of fees received in the *Barker* cases, . . . without revealing to the Court that [Ashcraft] is itself in breach of the contract it seeks to enforce because it has failed to comply with a condition precedent to that contract." In other words, Ms. Bennett argued that Ashcraft and its attorneys had acted in bad faith or without substantial justification because they disputed her contention that Ashcraft had agreed not to assert that she waived the right to challenge the Prenuptial Agreement. The circuit court denied the motions for sanctions on September 13, 2021.

Ms. Bennett premised her motions on Maryland Rule 1-341(a). That rule states:

> In any civil action, if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification, the court, on motion by an adverse party, may require the offending party or the attorney advising the conduct or both of them to pay to the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorneys' fees, incurred by the adverse party in opposing it.

"[A]warding attorney's fees under this rule is an extraordinary remedy, and it should be used sparingly." *Major v. First Virginia Bank-Central Maryland*, 97 Md. App. 520, 530 (1993); *accord Christian v. Maternal-Fetal Med. Assocs. of Md. LLC*, 459 Md. 1, 19 (2018). "Rule 1-341 sanctions should be imposed only when there is a clear, serious abuse of judicial process." *Black v. Fox Hills North Community Ass'n*, 90 Md. App. 75, 84 (1992).

Before *granting* a motion for sanctions, a court must make two separate findings. *Inlet Assocs. v. Harrison Inn Inlet, Inc*., 324 Md. 254, 267-68 (1991). "The judge must

first find that the conduct of a party during a proceeding, in defending or maintaining the action, was without substantial justification or was done in bad faith." *Christian v. Maternal-Fetal Med. Assocs. of Maryland, LLC*, 459 Md. at 20-21. Second, the judge must "find that the acts committed in bad faith or without substantial justification warrant the assessment of attorney's fees." *Id*. at 21.

Ordinarily, a trial court should make an express determination as to bad faith or substantial justification even when *denying* a motion for sanctions under Rule 1-341. *See Fowler v. Printers II, Inc*., 89 Md. App. 448, 487 (1991). Nevertheless, even without explicit findings, this Court will uphold the denial of a motion under Rule 1-341 where the record "clearly reflect[s] the meritlessness" of the motion. *Id.* If "the Rule 1-341 motion is patently groundless, *i.e*., if there is no basis for granting it apparent from the record, the trial judge need not issue any findings." *Id.*; *see also Century I Condo. Ass'n, Inc. v. Plaza Condo. Joint Venture*, 64 Md. App. 107, 115-17 (1986) (upholding a summary denial of a motion for sanctions when, upon a review of the record, the appellate court was satisfied that there was no basis for sanctions).

In this case, the court made no findings, but findings were unnecessary because it is abundantly clear from the record that the motions for sanctions were patently groundless. The motions were based on Ms. Bennett's disagreement with Ashcraft's interpretation of the law and the facts. Ms. Bennett contended that Ashcraft had falsely represented that Ms. Bennett had waived the right to challenge the enforceability of the Prenuptial Agreement. Ashcraft denied that it had agreed never, under any circumstances, to assert that Ms. Bennett had waived that right. In dismissing most of

53

Ms. Bennett's second amended complaint, including all of the counts relating to the *Barker* settlement, the court concluded that her allegations failed to state a claim upon which relief could be granted. In these circumstances, Ashcraft could not have acted in bad faith or without substantial justification. *See Needle v. White, Mindel, Clarke & Hill*, 81 Md. App. 463, 476 (1990).

## VII. FAILURE TO AWARD PRE-JUDGMENT INTEREST

On October 26, 2021, the circuit court granted Ashcraft's motion for summary judgment on its breach of contract claim and ordered Ms. Bennett to provide "a complete accounting of all funds she has received in the Barker cases from August 2018 forward[.]" From Ms. Bennett's accounting, Ashcraft calculated that she owed the firm the principal amount of $706,164.83. Ashcraft claimed the right to pre-judgment interest in the amount of $81,212.10.

Ms. Bennett did not dispute Ashcraft's calculations, but she opposed an award of pre-judgment interest.

On November 2, 2021, the trial court entered judgment in favor of Ashcraft and against Ms. Bennett in the amount of $706,164.83. The judgment did not include any pre-judgment interest. In its cross-appeal, Ashcraft challenges the court's decision not to award pre-judgment interest.

Pre-judgment interest compensates judgment creditors for their inability to use the funds that should have been in their hands before the entry of judgment. *See Nationwide Prop. & Cas. Ins. Co. v. Selective Way Ins. Co.*, 473 Md. 178, 189 (2021). "Prejudgment interest falls into one of two distinct categories—that which is discretionary and that

54

which is awarded as of right." *Id.* In general, "a party's entitlement to prejudgment interest is an issue for the finder of fact and accordingly 'left to the discretion of the jury, or the Court when sitting as a jury.'" *Id.* at 189-90 (quoting *I. W. Berman Props. v. Porter Bros., Inc.*, 276 Md. 1, 18 (1975)) (further citation omitted). "However, there are well-established exceptions to this general rule." *Id.* at 190.

"Prejudgment interest is available as a matter of right when 'the obligation to pay and the amount due' is 'certain, definite, and liquidated by a specific date prior to judgment' such that 'the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date.'" *Id.* (quoting *Buxton v. Buxton*, 363 Md. 634, 656 (2001)) (further citation omitted). A debt or amount is "liquidated" if it is "'settled or determined, esp[ecially] by agreement.'" *Baltimore County v. Aecom Servs., Inc.*, 200 Md. App. 380, 430 n.19 (2011) (quoting *Black's Law Dictionary* 949 (8th ed. 1999)).

The exception for debts that are certain, definite, and liquidated "'arises under written contracts to pay money on a day certain, such as bills of exchange or promissory notes, in actions on bonds or under contracts providing for the payment of interest, in cases where the money claimed has actually been used by the other party, and in sums payable under leases as rent . . . as well [as] in conversion cases where the value of the chattel converted is readily ascertainable.'" *Nationwide Prop. & Cas. Ins. Co. v. Selective Way Ins. Co.*, 473 Md. at 190 (quoting *Buxton v. Buxton*, 363 Md. at 656).

"[W]e review a circuit court's decision to award prejudgment interest under a de novo standard of review to determine whether it is legally correct." *Nationwide Prop. & Cas. Ins. Co. v. Selective Way Ins. Co.*, 473 Md. at 189.

Pursuant to the settlement agreement in the *Barker* cases, the United States Department of Justice wired the settlement proceeds into Ms. Bennett's escrow account on a periodic basis. The deposits occurred on the following dates and contained the following amounts:

| Date of DOJ Deposit into Plaintiff's Escrow Account | Amount of Deposit |
| --- | --- |
| 10/15/2018 | $164,870.11 |
| 1/7/2019 | $211,122.11 |
| 1/7/2019 | $96,271.67 |
| 2/4/2019 | $165,049.21 |
| 4/8/2019 | $165,049.21 |
| 7/22/2019 | $165,049.21 |
| 10/18/2019 | $165,049.24 |
| 1/1/2020 | $396,185.96 |
| 4/1/2020 | $165,049.22 |
| 7/1/2020 | $165,049.20 |
| 10/1/2020 | $165,049.23 |
| 1/1/2021 | $165,049.22 |
| 4/1/2021 | $165,049.19 |

From this chart, it is obvious that, on each occasion on which the Justice Department wired the settlement proceeds to Ms. Bennett's account, the amount that she received was certain, definite, and liquidated.

The client, Mr. Barker, was entitled to a certain, definite, and liquidated percentage of each settlement payment—specifically, 60 percent. The remaining 40 percent, which is also certain, definite, and liquidated, was to be divided between the lawyers.

The October 2015 settlement agreement obligated Ms. Bennett to pay Ashcraft a certain, definite, and liquidated percentage of the remaining amount—specifically, 75 percent.[29] Therefore, the amount due to Ashcraft from each settlement payment was certain, definite, and liquidated.

For example, on October 15, 2018, Ms. Bennett received $164,870.11 in settlement proceeds. Ms. Bennett was obligated to disburse 60 percent of that sum, or $98,922.07, to the client. After she had disbursed that sum, 40 percent of the settlement proceeds, or $65,948.04, remained. The October 2015 settlement agreement obligated Ms. Bennett to pay Ashcraft 75 percent of the remainder, or $49,461.03.

By withholding that certain, definite, and liquidated amount, and the certain, definite, and liquidated amounts that Ashcraft was entitled to receive from each of the subsequent payments, Ms. Bennett repeatedly deprived the firm of the use of a fixed and ascertainable amount of money. *See Harford County v. Saks Fifth Ave. Distrib. Co.*, 399 Md. 73, 95 (2007). In each instance, the deprivation began on the day when the payment was due—"a specific date prior to judgment"[30]—and continued until the date of the judgment. Ashcraft, therefore, was entitled to pre-judgment interest on each of the payments that Ms. Bennett withheld. The circuit court erred in concluding otherwise.

In the circuit court, Ashcraft presented calculations showing that it was entitled to $81,212.10 in pre-judgment interest at the legal rate of six percent per annum. *See* Md.

---

[29] I.e., 30 percent of the total amount of each settlement payment (.4 x .75 = .3).

[30] *Harford County v. Saks Fifth Ave. Distrib. Co.*, 399 Md. at 95.

Const. Art. III, § 57.  Ashcraft's calculations showed the amount of attorneys' fees that Ms. Bennett was obligated to pay out of each of the installments that she received from the Justice Department.  The calculations also showed the amount of interest that had accrued on each of the payments that Ms. Bennett failed to make from the date when Ms. Bennett had received the settlement proceeds until the date of the judgment.

Ms. Bennett did not challenge those calculations.  On remand, therefore, the circuit court shall revise the judgment to include the $81,212.10 in pre-judgment interest to which Ashcraft was entitled as a matter of law.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AWARD $81,212.10 IN PRE-JUDGMENT INTEREST TO APPELLEE; COSTS TO BE PAID BY APPELLANT.**